UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SANDRA THIBEAUX CALAIS           CIVIL ACTION NO. 6:14-cv-03467

VERSUS                           JUDGE DOHERTY

U.S. COMMISSIONER                MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Sandra Thibeaux Calais, fully exhausted her administrative

remedies prior to filing this action in federal court.  The claimant filed an application

for disability insurance benefits ("DIB") on June 3, 2013,[1] alleging disability

beginning on January 3, 2013[2] due to depression and anxiety.[3]  Her application was

---

[1]      Rec. Doc. 7-1 at 96.

[2]      Rec. Doc. 7-1 at 115, 136.

[3]      Rec. Doc. 7-1 at 127, 136.

denied.[4]  The claimant requested a hearing,[5] which was held on May 7, 2014 before Administrative Law Judge Robert Grant.[6]  At the hearing, the claimant requested that the alleged disability onset date be changed to December 21, 2012 and that her last employment be considered an unsuccessful work attempt.[7]  That request was apparently denied because the ALJ issued a decision on June 23, 2014,[8] concluding that the claimant was not disabled within the meaning of the Social Security Act ("the Act") from January 3, 2013 through the date of the decision.  The claimant asked for review of the decision,[9] but the Appeals Council concluded on October 31, 2014 that no basis existed for review of the ALJ's decision.[10]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

---

[4]      Rec. Doc. 7-1 at 55.

[5]      Rec. Doc. 7-1 at 62.

[6]      The hearing transcript is found at Rec. Doc. 7-1 at 26-44.

[7]      Rec. Doc. 7-1 at 40.

[8]      Rec. Doc. 7-1 at 13-21.

[9]      Rec. Doc. 7-1 at 8, 9.

[10]     Rec. Doc. 7-1 at 4.

## FACTUAL BACKGROUND

The claimant was born on October 5, 1956.[11]   At the time of the ALJ's decision, she was fifty-seven years old.  She has a high school education[12] and past relevant work experience as a seamstress and as a collector in a collection agency.[13]

The administrative record contains medical records for the claimant covering the time period from February 2009 to April 2014, and those related to the conditions that are allegedly disabling will be reviewed here.  The record demonstrates that, for over a decade, the claimant had a skin ailment characterized by intense itching and scratching that left scarring on her limbs and is related to her anxiety, depression, and stress.  The claimant's primary care physician is Deirdre L. Stelly, MD.  In October 2013, Dr. Stelly referred the claimant to Dr. M. Lucile Freeman, a psychologist, for treatment of her depression and anxiety.  Dr. Freeman saw the claimant on a weekly basis for a while and then began seeing her monthly.  Dr. Freeman also referred the claimant to psychologist Dr. Michael Berard for evaluation, in consultation with Dr. Stelly, of her medications.  The record indicates that the claimant is continuing to treat with Dr. Stelly, Dr. Freeman, and Dr. Berard.

---

[11]     Rec. Doc. 7-1 at 45.

[12]     Rec. Doc. 7-1 at 34.

[13]     Rec. Doc. 7-1 at 119.

On April 28, 2011,[14] the claimant complained to Dr. Stelly of anxiety and problems sleeping. Dr. Stelly prescribed Effexor. When the claimant returned to Dr. Stelly on June 17, 2011,[15] she indicated that she was experiencing less anxiety. Dr. Stelly also noted that the claimant's skin lesions were clearing. On January 6, 2012,[16] the claimant again sought treatment from Dr. Stelly for her itching skin and her anxiety. On May 30, 2012,[17] the claimant returned to Dr. Stelly, complaining of depression, anxiety, stress, insomnia, and heart palpitations. Dr. Stelly prescribed Prozac. On June 11, 2012,[18] the claimant told Dr. Stelly that she was feeling nervous and, in particular, was very nervous on her job. Dr. Stelly increased her Prozac prescription and suggested a trial of Ativan. The treatment notes from June 29, 2012,[19] indicate that the claimant was taking Ativan, Prozac, and Risperdal. She was still experiencing depression and anxiety. At the September 27, 2012 visit,[20] Dr. Stelly detected that the claimant had lost a significant amount of weight and

---

[14]     Rec. Doc. 7-1 at 205.

[15]     Rec. Doc. 7-1 at 2-4.

[16]     Rec. Doc. 7-1 at 202.

[17]     Rec. Doc. 7-1 at 201.

[18]     Rec. Doc. 7-1 at 200.

[19]     Rec. Doc. 7-1 at 199.

[20]     Rec. Doc. 7-1 at 198.

questioned whether the Ativan was too strong.  She decreased the dosage of that medication.  The claimant returned to Dr. Stelly on October 3, 2012,[21] complaining of increased anxiety, not sleeping well, and generally not feeling well.  She was continuing to experience heart palpitations.  Dr. Stelly modified her medications.  On December 13, 2012, the claimant continued to complain of palpitations and anxiety but reported that she had "great results" with Effexor.  However, she was stressed about starting a new job.

On June 19, 2013,[22] the claimant complained to Dr. Stelly of worsening anxiety with palpitations.  She was still taking Effexor and Ativan.  On August 1, 2013,[23] the claimant again saw Dr. Stelly.  She reported that she was feeling depressed lately, and her medications were again adjusted.

On September 4, 2013, the claimant was examined by clinical psychologist Dr. David E. Greenway, at the request of Disability Determination Services.[24]  The claimant told Dr. Greenway that she was married and had one child.  She reported that she had no friends, prefers to stay to herself, and has anxiety that leads to itching.

---

[21]     Rec. Doc. 7-1 at 197.

[22]     Rec. Doc. 7-1 at 194.

[23]     Rec. Doc. 7-1 at 193.

[24]     Dr. Greenway's report is in the record at Rec. Doc. 7-1 at 239-241.

-5-

She denied engaging in any social activities except for attending church and visiting with her family.  She denied having any hobbies other than walking and reading.  She stated that she shops for groceries and cooks approximately twice each week.  She reported that she had worked in collections for eleven years and found the work to be increasingly stressful.  She also reported that the stress from her job caused her to itch and break out in rashes, which resulted in her leaving her job.  Dr. Greenway suggested additional psychological testing and opined that "her report of the association of stress and itching/skin problems may be valid."  Dr. Greenway further opined that the claimant should be able to "sustain effort and persist at a moderate pace over the course of a routine 40-hour work week" except that "[h]er ability to tolerate job stress is likely poor and she would most appropriately be placed in a low demand setting."

Dr. Greenway found the claimant's presentation to be one of emotional restriction.  He opined that her insight and judgment were fair and found her to be cooperative during the evaluation.  He estimated that her GAF score was 65 for the past year.[25]  A GAF score of 65 indicates "some mild symptoms (e.g., depressed mood and mild insomnia OR some difficulty in social, occupations, or school

---

[25]        Rec. Doc. 7-1 at 241.

functioning. . . but generally functioning pretty well, has some meaningful interpersonal relationships."[26]

On September 30, 2013, Cathy Word, Ph.D. analyzed the claimant's case in response to a request for medical advice. Dr. Word did not examine the claimant. Dr. Word found that the claimant's symptoms were less than marked.

The claimant returned to Dr. Stelly on November 18, 2013,[27] having a lot of anxiety and exhibiting an anxious mood. Dr. Stelly diagnosed anxiety, palpitation, and prurigo nodularis.[28] Dr. Stelly planned to increase the dosage of Pristiq and to discuss the claimant's case with Dr. Berard. The treatment notes indicate that the claimant was unable to tolerate five medications that were previously prescribed, and that she was then currently taking Hydroxyzine for itching, Pristiq, and Risperdal.

On October 14, 2013, the claimant had her initial appointment with Dr. Freeman, a psychologist, upon referral from Dr. Stelly, for symptoms of depression

---

[26]     Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") at 32.

[27]     Rec. Doc. 7-1 at 250-261.

[28]     "Prurigo nodularis is an eruption of lichenified or excoriated nodules caused by intractable pruritus that is difficult to treat." PubMed.com, U.S. National Library of Medicine, National Institutes of Health, http://www.ncbi.nlm.nih.gov/pubmed/11209117 (last visited Jan. 28, 2016). Pruritus is severe itching. The American Heritage Dictionary (Second College Edition, 1982), at 998.

and anxiety.[29]  Her major complaint was that she experienced itching, followed by scratching to the point that she had scarred her body.  The claimant told Dr. Freeman that she had a ten to thirteen year history of itching and scratching, that she had seen several doctors for the condition, and that Dr. Stelly thought it was a nervous condition.  The claimant reported symptoms of depression, trouble coping, feeling unworthy, self doubt, feeling unintelligent, nervous stomach, not wanting to get out of bed, not wanting to be around other people, and obsessive behavior such as checking and rechecking that the curling iron is turned off and that the doors are locked.  She reported having had suicidal thoughts.  She further reported that the collections work she had previously done made her nervous.  She was also overwhelmed by her subsequent job in billing, which lasted only nine days.  She also told Dr. Freeman that she had difficulty making simple decisions, did not want to do anything outside her house, and did not want to do much inside her house.

The claimant again saw Dr. Freeman on October 21, 2013.[30]  Dr. Freeman reported that the claimant worries excessively, displays obsessive behavior, is anxious, and her anxiety leads to itching and scratching.  Dr. Freeman referred the claimant to Dr. Michael Berard for a medication evaluation.

---

[29]     Rec. Doc. 7-1 at 271-272.

[30]     Rec. Doc. 7-1 at 270.

The claimant returned to Dr. Freeman on October 29, 2013,[31] at which time they began working on a plan to address her negative expectations and self criticism.

On November 4, 2013,[32] the claimant again saw Dr. Freeman.  Dr. Freeman noted that they were developing a strategy for coping with the claimant's depression.

The claimant again saw Dr. Freeman on November 11, 2013,[33] and explained that she becomes aggravated and irritated whenever she is in the presence of others and also when she is thinking about being in the presence of others.  She also obsesses whenever she has to do something new.

The claimant met with Dr. Freeman again on November 18, 2013.[34]  They worked on strategies for managing her anxiety and her itching/scratching.  On that same day, the claimant met with Dr. Berard for a psychotropic medication consultation.[35]  The claimant presented with a flat, depressed affect.  She described a chronic history of depression, lack of drive, isolation from other people, and sadness but she denied suicidal ideation.  She also reported a ten to twelve year experience

---

[31]     Rec. Doc. 7-1 at 269.

[32]     Rec. Doc. 7-1 at 268.

[33]     Rec. Doc. 7-1 at 267.

[34]     Rec. Doc. 7-1 at 266.

[35]     Rec. Doc. 7-1 at 281-282.

with "pruritus (itching)," which Dr. Berard associated with Dermatillomania.[36]  Dr. Berard deferred to Dr. Freeman with regard to diagnostic impressions and consulted with Dr. Stelly regarding a medication regime for the claimant.

On November 21, 2013,[37] Dr. Berard consulted with Dr. Stelly regarding the claimant's medication.

On December 12, 2013,[38] the claimant again visited Dr. Berard.  She presented with a slightly tense affect, and they discussed modification of her medication.  The claimant again saw Dr. Berard on January 9, 2014,[39] when adjustment of her medication was again discussed.

On January 21, 2014, the claimant returned to Dr. Freeman,[40] and she noted some success with the strategies they had implemented.

---

[36]     "Dermatillomania is a condition where a person feels compelled to pick at their skin, to the point where it causes visible wounds."   NHS Choices, http://www.nhs.uk/Conditions/dermatillomania/Pages/Introduction.aspx (last visited Jan. 28, 2016).

[37]     Rec. Doc. 7-1 at 280.

[38]     Rec. Doc. 7-1 at 279.

[39]     Rec. Doc. 7-1 a 278.

[40]     Rec. Doc. 7-1 at 265.

The claimant saw Dr. Berard again on February 8, 2014.[41]  She had titrated the Pristiq down to termination, was taking Veniafaxine, and was titrating Effexor upward.  She was also continuing to take Risperdal and other medications.

On February 18, 2014,[42] Dr. Freeman noted that the claimant's medications had been modified, resulting in lethargy and lack of motivation to do things. Improvement in the itching/scratching was noted.  However, Dr. Freeman noted that the "introduction of heightened stress or depressive symptoms" would likely result in a "return to the itching scratching as it has been an ongoing problem for many years, leaving her with multiple scars on her legs and arms."  Because the claimant had experienced an overall decrease in anxiety and depression since starting treatment with Dr. Freeman, the frequency of visits was being reduced to a monthly basis.

The claimant next saw Dr. Berard on March 10, 2014.[43]  She acknowledged a recurring pattern of itching and scratching, and her medications were again adjusted.

On March 21, 2014,[44] Dr. Freeman recapped her treatment of the claimant in a letter to the claimant's attorney.  She explained that, although the claimant was

---

[41]     Rec. Doc. 7-1 at 277.

[42]     Rec. Doc. 7-1 at 264.

[43]     Rec. Doc. 7-1 at 276.

[44]     Rec. Doc. 7-1 at 263.

doing better, "she would be expected to deteriorate into a state of nonfunctionality were she to return to the stressors of employment."  Dr. Freeman also stated that the claimant "would not be able to manage her anxiety in a situation where she would experience the normal stressors of work, including the work itself, co-workers, and expectations."

On April 2, 2014,[45] the claimant presented to Dr. Berard with a flat/depressed affect.  She acknowledged that stressful situations activate the compulsive Dermatillomania Syndrome.  She was grieving the loss of employment and aware that the scratching could cause systemic infections.  Dr. Berard opined that "as a result of her chronic and acute exacerbation of symptoms," the claimant "would be unable to respond to traditional labor standards (8 hours a day, five days a week).  More specifically, it would be unrealistic to expect that she could consistently comply with an employment schedule, either part or full time. . . ."

On April 30, 2014,[46] Dr. Berard sent a letter to the claimant's attorney, reiterating his opinions.  He stated that the claimant "continues to experience chronic with acute exacerbation of psychiatric symptoms that negates her ability to remain reliable in response to traditional labor standards.  More specifically, it would be

---

[45]      Rec. Doc. 7-1 at 275.

[46]      Rec. Doc. 7-1 at 274.

unrealistic to expect that she could consistently comply with an employment schedule, either part or full time. . . ."

At the time of the hearing in May 2014, the claimant was taking the following prescription medications:  Effexor, Ativan, Hydroxyzine HCL, and Risperidone.[47]

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[48]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[49]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[50]

---

[47]      Rec. Doc. 7-1 at 169.

[48]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[49]      *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[50]      *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[51]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[52]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[53]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[54]

---

[51]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[52]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[53]     *Martinez v. Chater*, 64 F.3d at 174.

[54]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

**B.**   **ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[55]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[56]   A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[57]

---

[55]   See 42 U.S.C. § 423(a).

[56]   42 U.S.C. § 1382c(a)(3)(A).

[57]   42 U.S.C. § 1382c(a)(3)(B).

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings. At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled will be made at step four. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine whether the claimant can perform any other work at step five.[58]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[59] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the

---

[58]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[59]     20 C.F.R. § 404.1520(a)(4).

record.[60]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[61]

The claimant bears the burden of proof on the first four steps.[62]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[63]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[64]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[65]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[66]

---

[60]  20 C.F.R. § 404.1545(a)(1).

[61]  20 C.F.R. § 404.1520(e).

[62]  *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[63]  *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[64]  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[65]  *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[66]  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

### D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 3, 2013.[67]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  depression and an anxiety disorder.[68]  This finding is supported by evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[69]  The claimant has not challenged this finding.

The ALJ found that the claimant has the residual functional capacity to perform "a full range of work at all exertional levels but with the following non-exertional limitations:   simple routine work and repetitive tasks with one-to-two step instructions in a work environment free of any fast-paced production requirements, with few, if any workplace changes."[70]  The claimant challenges this finding.

---

[67]     Rec. Doc. 7-1 at 15.

[68]     Rec. Doc. 7-1 at 15.

[69]     Rec. Doc. 7-1 at 15.

[70]     Rec. Doc. 7-1 at 19.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a collector.[71]  Consequently, the ALJ found that the claimant is not disabled and did not proceed to the fifth step of the analysis.  The claimant challenges this finding.

### E.   THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) by failing to give controlling weight to the medical opinions of Dr. Freeman and Dr. Berard, resulting in the ALJ's evaluation of the medical opinion evidence and residual functional capacity not being supported by substantial evidence; and (2) by failing to properly evaluate the claimant's credibility, resulting in a credibility finding that is not supported by substantial evidence.

### F.   DID THE ALJ ERR IN EVALUATING THE MEDICAL OPINION EVIDENCE?

The Social Security regulations and rulings explain how medical opinions are to be weighed.[72]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record.  In this case, the ALJ gave "great weight" to the opinions of Dr. Word,[73] "significant

---

[71]     Rec. Doc. 7-1 at 20.

[72]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[73]     Rec. Doc. 7-1 at 19.

weight" to the opinions of Dr. Greenway,[74] and "some weight" to the opinions of Dr. Freeman and Dr. Berard.[75]   The claimant argues that this weighing of the medical opinions was erroneous.

The ALJ has sole responsibility for determining the claimant's disability status.[76]  Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[77] In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[78]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[79]  Good cause may be

---

[74]     Rec. Doc. 7-1 at 20.

[75]     Rec. Doc. 7-1 at 20.

[76]     *Newton v. Apfel*, 209 F.3d at 455.

[77]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[78]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[79]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[80]  Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[81]

The ALJ did not explain why he gave "great weight" to Dr. Word's opinions, "significant weight" to Dr. Greenway's opinions, and only "some weight" to the opinions of Dr. Freeman and Dr. Berard.  This alone constitutes error because an ALJ's unfavorable "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."[82]  When an ALJ declines to give "controlling weight" to a treating

---

[80]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[81]     *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

[82]     SSR 96-2p.

physician's opinions, the ALJ must consider six factors before assigning weight to the physician's opinions:  (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.[83]  The ALJ did not address any of these factors.  Therefore, the ALJ erred when he gave "some weight" rather than "controlling weight" to the medical opinions of Dr. Freeman and Dr. Berard.

Furthermore, Dr. Word is a state agency medical consultant who did not examine the claimant.  Her opinion that the claimant was not disabled was dated September 30, 2013 and was based on treatment notes from Dr. Stelly, the claimant's primary care physician, and on the opinions of the consultative examiner, Dr. Greenway.  Dr. Stelly is not a psychologist or psychiatrist.  Therefore, while her treatment notes are valuable, they are necessarily limited.  Psychologist Dr. Greenway saw the claimant only once.  In the limited context of his single encounter with the claimant, he found that "her report of the association of stress and itching/skin problems may be valid," and he recommended further psychological testing.  In

---

[83]    20 C.F.R. § 404.1527(c)(2); *Myers v. Apfel*, 238 F.3d at 621; *Newton v. Apfel*, 209 F.3d at 456.

particular, he recommended an MMPI.  The record does not indicate that the ALJ required this recommended test to be performed.  Dr. Greenway also recommended that the claimant be referred to a vocational-rehabilitation professional.  Again, there is no evidence that the ALJ implemented this recommendation.  Importantly, both Dr. Greenway and Dr. Word provided their opinions before the claimant began treating with Dr. Freeman and Dr. Berard.  The record shows that Dr. Freeman saw the claimant eight times and Dr. Berard saw the claimant seven times over a seven month period.  Each of those physicians developed a long-term relationship with the claimant marked by frequent encounters.  Their treatment of her was based on their own observations on multiple occasions, the information that the claimant supplied over time, the claimant's response to techniques recommended by Dr. Freeman, and the claimant's response to the various medications that were prescribed by Dr. Berard to treat her conditions.  Dr. Word's opinions as well as Dr. Greenway's did not have the benefit of information from Dr. Freeman and Dr. Berard; instead, they were based on incomplete and out-of-date evidence.

This Court finds that, in weighing the opinions of the various medical sources, the ALJ applied an improper legal standard by placing undue reliance on a non-examining source and a source who saw the claimant only once, which led to decisions on residual functional capacity and disability that are not supported by

-23-

substantial evidence.  This Court further finds that the ALJ should have given controlling weight to the opinions of Dr. Freeman and Dr. Berard – or fully and completely explain why it is not appropriate to do so.  Accordingly, this Court recommends that this matter be remanded for a proper weighing of medical opinions, another evaluation of the claimant's residual functional capacity, and another decision concerning her alleged disability.

## G.   DID THE ALJ ERR IN EVALUATING THE CLAIMANT'S CREDIBILITY?

The claimant contends that the ALJ erred in finding that she is "not entirely credible."[84]  The ALJ stated that "objective medical evidence fails to support her subjective complaints."[85]  This conclusion can be reached only by discounting the opinions of the claimant's treating physicians, Dr. Freeman and Dr. Berard.  Dr. Freeman correlated the claimant's itching and scratching with increased anxiety and depression,[86] noted that her symptoms were decreased with the implementation of certain behavioral techniques, but opined that the stress of returning to work would likely cause the symptoms to recur.[87]  Dr. Berard similarly found that "stressful

---

[84]    Rec. Doc. 7-1 at 19.

[85]    Rec. Doc. 7-1 at 19.

[86]    Rec. Doc. 7-1 at 263, 264.

[87]    Rec. Doc. 7-1 at 263.

-24-

situations usually activate the compulsive Dermatillomania Syndrome" and opined that a return to work would likely exacerbate her symptoms.[88]

Additionally, the ALJ stated that the claimant's lack of credibility was evidenced by "[t]hese types of inconsistencies," suggesting that there were multiple inconsistencies in the record between what the claimant said she could do and what she could actually do.  In fact, however, the ALJ noted a single inconsistency:  the claimant told Dr. Greenway that she was able to cook but she testified at the hearing that she was unable to cook.[89]  In fact, however, there is no such inconsistency.  Dr. Greenway reported that the claimant told him she cooks "maybe twice a week,"[90] and the claimant testified at the hearing that she cooks approximately two to three days per week.[91]  Not only was the claimant consistent with regard to the frequency that she cooks, the ALJ did not identify any other inconsistency in the record that demonstrated a lack of credibility.

Finally, the record indicates that the claimant worked consistently for many years, first as a seamstress and later as a collector.  The ALJ's decision does not

---

[88]     Rec. Doc. 7-1 at 275.

[89]     Rec. Doc. 7-1 at 19.

[90]     Rec. Doc. 7-1 at 240.

[91]     Rec. Doc. 7-1 at 33.

reference this fact in connection with her credibility.  The claimant correctly argues that there is jurisprudence from other circuits holding that a claimant with a good work record is entitled to substantial credibility when claiming that she can no longer work due to a disability.[92]

Accordingly, this Court finds that the ALJ's credibility determination is not supported by substantial evidence and recommends that this matter be remanded so that the claimant's credibility can be reevaluated.

### CONCLUSION AND RECOMMENDATION

This Court finds (1) that the ALJ erred by failing to give the claimant's treating physicians controlling weight or to explain why controlling weight was not appropriate in this case, and (2) that the ALJ erred in evaluating the claimant's credibility.  Accordingly,

**IT IS THE RECOMMENDATION** of this Court that the decision of the Commissioner be **REVERSED and REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) properly weigh the medical source opinions; (2) properly evaluate the claimant's credibility; (3)

---

[92]     See, e.g., *Rivera v. Schweiker*, 717 F.2d 719, 725 (2nd Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."); *Tayborn v. Harris*, 667 F.2d 412, 414 n. 6 (3rd Cir. 1984) ("when the claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility.").

determine the claimant's residual functional capacity; (4) determine whether the claimant can perform her past relevant work; and, (5) if the claimant cannot perform her past relevant work, determine whether the claimant can perform any other work.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[93]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds

---

[93]     See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 5th day of February 2016.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

COPY SENT:

DATE:   2/5/2016
BY:            EFA
TO:            RFD
                cg

-28-